UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL AND MILLY PATENAUDE,
Individually and as Parents and Guardians of
D.P.,

                              Plaintiffs,

        v.                                        3:03-CV-1016

SALMON RIVER CENTRAL SCHOOL DISTRICT,
GLENN BELLINGER, Individually and as
Superintendent of SRCSD, MARK CZADZECK,
Individually and as Princiapl of the High School of
SRCSD,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**APPEARANCES:**

Law Offices of Jerry C. Leek                Jerry C. Leek, Esq.
107 S. Canton Rd.
Potsdam NY 13676
*Attorney for Plaintiff*

RYAN & SMALLACOMBE, PLLC                Claudia A. Ryan, Esq.
100 State St., Suite 800
Albany NY 12207
*Attorneys for Defendant*

THOMAS J. McAVOY
Senior United States District Judge

<u>**MEMORANDUM - DECISION and ORDER**</u>

**I.        INTRODUCTION**

        Plaintiffs Michael and Milly Patenaude commenced the instant action on behalf of

their daughter, D.P., asserting claims pursuant to 42 U.S.C. § 1983 and 20 U.S.C. § 1681, et

seq. ("Title IX"), arising out of alleged harassment suffered by D.P. while a student at the

Salmon River Central School District.  Plaintiffs also have pleaded a claim for negligence.

Plaintiffs Michael and Milly Patenaude bring a derivative claim on their own behalf.  Currently

before the Court is Defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56

seeking dismissal of the Complaint in its entirety.

## II.    FACTS

At all times relevant hereto, D.P. (hereinafter referred to as "Plaintiff") was a student

enrolled at the Defendant Salmon River Central School District ("SRCSD").  Plaintiff's mother

is Milly Patenaude.  Currently, Plaintiff is in the twelfth grade and plans to graduate in June

2005.  Plaintiff has attended the SRCSD since elementary school and did not experience any

problems before the tenth grade.

Beginning in September 2002, Plaintiff began experiencing problems with other

students at the SRCSD.  At that time, two students "M.C." and "J.J."[1] commenced making

remarks to Plaintiff such as calling her "slut" and "bitch."  On September 13, 2002, Defendant

Marc Czadzeck ("Czadzeck"), the principal of the school, became aware that Plaintiff and

M.C. had an argument.  Czadzeck informed Plaintiff's mother about the incident.  Plaintiff

was given two periods of in-school suspension for her part in the argument and M.C. was

given a verbal warning.[2]

Also beginning in September 2002, Gilda Charlebois, a SRCSD hall monitor, began

following and "shadowing" Plaintiff.  Pl.'s Ex. C at Interrog. No. 1.  Charlebois also made

---

[1] In accordance with N.D.N.Y.L.R. 8.1(2), only the initials of minor children are used herein.

[2] Plaintiffs contend that the difference in punishments between the two students was discriminatory.  Obviously, the discipline meted out to each of the students is different.  However, Plaintiffs fail to specify on what prohibited basis the different punishments can be deemed to be unlawful discrimination.

comments to Plaintiff such as calling her a "tramp" and telling her to "stop flaunting her ass in the hallways." Id. Plaintiff did not complain to Czadzeck about Charlebois until mid-November 2002. Id. After Plaintiff complained, Czadzeck spoke to Charlebois and moved her to a different portion of the school. No further incidents occurred with Charlebois. Id.

The next incident occurred in November 2002 when Plaintiffs were in a local shopping mall (and not on school grounds). At that time, three individuals, including SRCSD students D.T. and C.K. physically attacked Plaintiff. D.T., a Native American, punched Plaintiff and called her names such as "white bitch" and "white whore." There is no indication in the record that Defendants were made aware of this incident.

On February 20, 2003, Plaintiff was attending a hockey game on school property when C.S., a female, Native American, came up and pushed her, grabbed her, and started punching her. This fight was broken up. The next day, teacher Sarah Boyce ("Boyce") informed Czadzeck of the February 20 fight. According to Czadzeck, Boyce told him that Plaintiff had called M.C. a "bitch" and "fucking cunt." Plaintiff denies calling M.C. any names. Czadzeck spoke with Milly Patenaude regarding the incident. C.S. and Plaintiff were given two days of in-school suspension.

Another incident occurred on February 26, 2003, when C.L., a Caucasian female, called Plaintiff some name and punched her in the face causing Plaintiff certain personal injuries. Plaintiff never had any problems with C.L. prior to February 26. As a consequence of this incident, C.L. was suspended for five days.[3] There have been no further confrontations between C.L. and Plaintiff since February 26, 2003.

---

[3] Five days is the maximum punishment a principal can give without school board action.

On March 18, 2003, M.C. and J.D. called Plaintiff a "whore."  On March 20, 2003, Plaintiff went to the bathroom where she encountered students C.S., M.C., and J.J.  The three students left Plaintiff in the bathroom, turned off the bathroom lights from outside, and held the door shut for five minutes while calling Plaintiff a "stupid white bitch" and threatening her.  School employee Mrs. Chapman ("Chapman") intervened.  Chapman later reported the incident to Czadzeck.  Czadzeck spoke to the three students involved.  C.S. was given two days of suspension and M.C. and J.J. were given verbal warnings.

On March 21, 2003, C.S. elbowed Plaintiff and called her a "fucking dyke." According to Plaintiff, Czadzeck was informed of the incident, but is unaware what actions, if any, he took in response.  Czadzeck, on the other hand, testified that C.S. was not in school that day because she had been suspended.

On March 26, 2003, student C.S. stood in the doorway of the classroom Plaintiff was attempting to enter, put her leg across the doorway, and called Plaintiff a "white bitch." The teacher, Mr. Girard, told C.S. to sit down, which she did.  On that same day, student Ca.L. and C.S. referred to Plaintiff as a "skank" and told her she was "gay."[4]  Ca.L. and C.S. also tried to get another student, L.B., to throw a ball at Plaintiff during gym class.  L.B. did not throw the ball.  Plaintiff reported this latter incident to the teacher, Ms. Fee, who responded that she would not let the other students in the classroom if they returned. Plaintiff did not report these incidents to Czadzeck.[5]

---

[4] At deposition, Plaintiff testified that the term "skank" means "nasty" and that "gay" means "stupid."  Plaintiff further testified that these terms are not sexual terms.

[5] Plaintiff claims that she attempted to report these instance to Czadzeck, but he was not there when she went to report it.  There is no evidence in the record that she attempted to report the incident at another time.

On March 31, 2003, Plaintiff participated in a mediation session with M.C.  The mediation was arranged by the school with representatives from the Northern New York Center for Conflict Resolution.  During the session, M.C. walked out.  On that same day, while Plaintiff was walking to class, students Ca.L. and C.S. stated that "we are going to kick your white fucking ass."  Plaintiff asked Czadzeck for a pass to the library due to the threats by Ca.L. and C.S.  Czadzeck granted the pass, allowing her to go to the library rather than attend her eighth period class (which C.S. also was in).  Czadzeck verbally reprimanded Ca.L. and C.S.

On or about April 10, 2003, Plaintiff learned that J.J. and M.C. had posted a doctored picture depicting Plaintiff and two of her friends performing oral sex and also had profanities written on the picture.  Students N.O. and S.B. (two of the students in the picture) went to Czadzeck to complain about the picture.  Employees of the SRCSD "went around the school collecting all the pictures they could find that were posted throughout the school."  Pl.'s Ex. C at p. 10.  This incident was not reported until approximately one week later.[6]  Id. According to the affidavits of N.O. and S.B., before the picture was distributed, they had learned of its creation and asked Czadzeck to check the lockers of the girls believed to have been involved in creating the pictures.  Czadzeck declined to do so.  After the pictures were posted, Czadzeck purportedly investigated the incident, but apparently was unable to determine who was responsible.  Plaintiff, on the other hand, claims to know who was responsible for creating the picture.

---

[6] April 10 was the last day of school before a week long break.

By letter dated April 25, 2003, Plaintiff's parents sent a letter to the SRCSD outlining the incidents that occurred between September 2002 and April 2003. In response to the letter, Defendants assigned a hall monitor, Mrs. Yell ("Yell"), to Plaintiff. Yell was to watch Plaintiff travel between classes. Plaintiff testified at deposition that she did not have any complaints about Yell and that she did not recall ever complaining to Czadzeck that Yell was not doing her job. Plaintiffs admit that having Yell assigned to Plaintiff helped decrease the frequency and severity of the incidents; although it did not stop them completely.

On April 29, 2003, Ca.L., a female, called Plaintiff a "white slut" while passing in the hallway. On May 2, 2003, while in class, Ca.L. elbowed Plaintiff. Plaintiff does not recall reporting these incidents to Czadzeck. Plaintiff claims that this incident was witnessed by a teacher, but that the teacher did not do anything in response.

On May 6, 2003, between classes, Ca.L. referred to Plaintiff as a "fucking dyke." Apparently, Yell was not present when this incident occurred. Plaintiff reported the incident to Yell.

On May 8, 2003, students B.S. and D.T. called Plaintiff "webbed feet", apparently referring to a condition that Plaintiff has. Yell was not present when this occurred. Plaintiff did not report this to the school.

On May 12, 2003, C.S. referred to Plaintiff as a "skank" and a "gross pimple face." Plaintiff did not report this to Czadzeck.[7]  On May 14, 2003, C.S. pushed a student into Plaintiff. This was reported to Czadzeck on May 15. C.S. was given a one day suspension for the incident.

---

[7] Plaintiff attempted to report the incident, but Czadzeck was unavailable. There is no indication that Plaintiff made follow-up attempts to report the incident to Czadzeck.

On May 16, 2003, C.L. referred to Plaintiff as a "cow" and told her that she "smelled like shit." Mrs. Ellsworth, the librarian, overheard these remarks. Ellsworth reported the matter to Czadzeck. Czadzeck verbally warned C.L. On that same day, C.S. referred to Plaintiff as a "fucking dyke."[8] Later on May 16, C.S. and D.T. called Plaintiff a "rat" and "fucking bitch slut."

On May 20, 2003, C.S. referred to Plaintiff as a "fucking dyke." That same day, M.B. called Plaintiff a "stupid slut." On May 29, 2003, D.L. elbowed Plaintiff and called her a "fucking slut." On June 3, 2003, C.S. called Plaintiff a "skank." On June 12, 2003, C.S. called Plaintiff a "dyke" and "gross." Plaintiff did not report these incidents to Czadzeck.

On June 19, 2003, Plaintiff and another student were advised that some other students were waiting outside and threatening violence. This was immediately reported to Czadzeck, who escorted Plaintiff outside. As Plaintiff attempted to drive away, her car was blocked by other students' cars. Czadzeck instructed Plaintiff to go to his office. Czadzeck contacted the police and Plaintiff's parents. The police escorted Plaintiff home.

On August 1, 2003, off of school grounds, C.L. called Plaintiff a name. Also during the summer of 2003 and off of school grounds, Ca.L. attacked Plaintiff in a parking lot.

After September 2003, while Plaintiff was in the eleventh grade, Yell continued to act as a monitor. Yell followed Plaintiff from every class. Plaintiff testified that having Yell worked well and the problems with the other girls decreased. When Plaintiff complained that her eleventh grade schedule included classes that C.S. would be in, the school changed Plaintiff's schedule so she did not have to attend any classes with C.S. During the eleventh

---

[8] At deposition, Plaintiff testified that the phrase "fucking dyke" is not meant sexually, but is said just to be mean.

grade, Plaintiff opted to attend some classes at BOCES because she did not want to attend the SRCSD for fear for her safety.  Half of Plaintiff's school day was at BOCES.  While Plaintiff was at the SRCSD, C.S. continued to make comments to Plaintiff from time to time, but it was less frequent than before and there were no physical assaults.

On September 8, C.S. called Plaintiff a "fucking whore" and "fucking gay bitch." Czadzeck gave C.S. a verbal warning.  Two other incident occurred in September, including C.S. calling Plaintiff a "bitch" and another student, Ch., calling Plaintiff a "gay bitch."  These incidents were not reported.

On November 25, 2003, while Plaintiff was at BOCES, she was elbowed by Ca.L. Ca.L. was suspended by BOCES.  On that same day, Ca.L. and H.P. threw a bottle of something red on Plaintiff's car.  On December 3, 2003, while at BOCES, H.P. threw a bottle of food coloring at Plaintiff and spit at her.  H.P. was suspended.  No further incidents occurred during the eleventh grade.

After the eleventh grade had completed, Plaintiff was assaulted by a SRCSD student.  The incident did not occur on SRCSD property.  On January 3, 2004, M.O. pushed and attacked Plaintiff as she was leaving gym class.  This was the last incident alleged to have occurred to Plaintiff.

At this time, all of the other students involved in this matter, C.S., Ca.L., C.L., J.J., Ch., and D.L., have either graduated or been expelled and are no longer students at the SRCSD for the 2004-2005 school year.

## III.    STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v.

Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  With this standard in mind, the Court will address Defendants' motion.

**IV.      DISCUSSION**

      **a.      Individual Liability Under Title IX**

      Defendants first move to dismiss the Title IX claims against the individuals. Because there is no individual liability under Title IX, Linder v. City of New York, 263 F. Supp.2d 585, 595 (E.D.N.Y. 2003); Niles v. Nelson, 72 F. Supp.2d 13, 17 (N.D.N.Y. 1999), all such claims are dismissed as to the individual Defendants.

**b.**       **Institutional Liability Under Title IX**

Defendants next argue the Title IX claims must be dismissed because there is no evidence of harassment on account of sex.  Plaintiff responds that she was repeatedly called names such as "gay", "dyke", and "bitch," all of which have clear sexual connotations.

Under Title IX, a school may be held liable for student-on-student harassment if the school is deliberately indifferent to the harassment.  Davis v. Monroe County Bd. of Educ., 119 S. Ct. 1661, 1674 (1999).  To be sufficiently harassing, the conduct must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school."  Id. at 1675.  Of course, the conduct must also be "gender-oriented."  Id.  To establish a hostile educational environment - sexual harassment claim, a plaintiff must show not only that the educational environment was hostile or abusive, "but actually constituted 'discrimina[tion] ... because of ... gender.'"  Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998); Hayut v. State Univ. of New York, 352 F. 3d 733, 745 (2d Cir. 2003); Leibovitz v. New York City Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001) ("[T]he discrimination must be *because of sex*.") (emphasis in original).  In other words, Plaintiff must demonstrate that she was harassed because she was female.  See Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000).  A school district acts with deliberate indifference only where its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  Id.  In analyzing Title IX harassment claims, courts frequently borrow from the body of law developed under Title VII.  Torres v. Pisano, 116 F.3d 625, 630 (2d Cir. 1997).

Viewed in isolation, the words used here ("bitch," "dyke," "slut," "whore," etc.) suggest that Plaintiff was being harassed on account of her gender.  After all, these terms

- 10 -

tend to be used in a derogatory manner towards females.  The Court must be careful, however, not to make broad generalizations or assumptions based on the mere use of these words.  Oncale, 118 S. Ct. at 1002 ("We have never held that . . . harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations."); see also Hocevar v. Purdue Frederick Co., 223 F.3d 721, 737 (8th Cir. 2000) ("Gender-based insults may create an inference that discrimination was based on sex. See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).  However, mere use of the word 'bitch,' without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude.  See Kriss v. Sprint Communications Co., 58 F.3d 1276, 1281 (8th Cir. 1995).").  The ultimate issue is the reasons for *the individual plaintiff's* treatment.  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  In other words, was Plaintiff being harassed because of her gender or for some other reason?

"Whatever evidentiary route the plaintiff chooses to follow, . . . she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex." Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1002 (1998) (emphasis and alteration in original).  Determining what sorts of behavior constitute discriminatory action that creates a hostile work environment requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target ... [and it] often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale, 118 S. Ct. at 1003.  Thus, we must not look at each word or insult in isolation, but must consider the totality of the circumstances and the context in which the complained of incidents occurred.

See Hayut v. State Univ. of New York, 352 F.3d 733, 745 (2d Cir. 2003) ("Making a 'hostility'

determination in the educational context, as in the employment context, entails examining the

totality of the circumstances."); Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188

(2d Cir. 2001) ("Courts look at all circumstances to ascertain whether an environment is

sufficiently hostile or abusive."); see e.g. Knievel v. E.S.P.N., 393 F.3d 1068, 1074 (9th Cir.

2005) ("Although the word 'pimp' may be reasonably capable of a defamatory meaning when

read in isolation, we agree with the district court's assessment that 'the term loses its

meaning when considered in the context presented here.' As discussed in more detail herein,

the term 'pimp' as used on the EXPN.com website was not intended as a criminal

accusation, nor was it reasonably susceptible to such a literal interpretation.").

   Without question, Plaintiff was treated in a despicable and unacceptable manner by

other students.  That said, however, there is insufficient evidence in the record before the

Court suggesting that Plaintiff was harassed by other students because she was female.

The Court is cognizant of the numerous epithets hurled at Plaintiff that appear to have a

sexual connotation.  Notwithstanding this, considering the totality of the circumstances, the

record evidence demonstrates that Plaintiff was called names and physically assaulted not

because of her gender, but because the other students were being cruel to her for other

reasons.  There is insufficient evidence that the other students acted out against Plaintiff

because she was female. Plaintiff was not only subjected to arguably gender-based terms

(i.e. "bitch", "slut"), but to other generally contemptible, rude, non-sexual comments (e.g.

"gross pimple face," "fucking white ass," "webbed feet").  She also was physically assaulted

(punched in the face, pushed, elbowed) and otherwise treated (e.g., being locked in the

bathroom, being threatened with non-sexual violence) in ways that do not suggest gender-

based discrimination.  She was not, for example, subjected to groping of genitalia or her breasts or other sexual contact, she was not sexually propositioned, she was not otherwise subjected to the types of conduct typically associated with sexual harassment, and there is insufficient evidence tending to suggest that she was treated in a particular manner because of sex.

Moreover, and, perhaps, more telling is that Plaintiff herself testified that the terms used by the other students were not meant sexually, but are frequently used by high-school students in a generally mean way.[9]  At deposition, Plaintiff testified that "gay" means "stupid" and that "gay," "fucking dyke," "bitch," and "skank" are not sexual terms.  Pl. Dep. at 56-58 (testifying that "skank" means "nasty" and "gay" means "stupid."), 118-119; 134 (testifying that "bitch" is non-sexual); 135 (testifying that calling someone a "gay bitch" means "[t]hat you don't like me very much.").  Plaintiff also testified that people are called "bitches" regardless of their gender.  Id. at 134.  In fact, Plaintiff specifically testified that "they [the other students] don't really mean it....[T]hey just say it to be rude."  Pl. Dep. at 119.[10]  Plaintiff also testified

_____

[9] Plaintiff testified that she, herself, uses some of these words.  See, e.g., Pl.'s Dep. at 57, 119.

[10] In her affidavit submitted in opposition to Defendants' motion for summary judgment, Plaintiff attempts to explain away her deposition testimony stating that "[g]ay has two definitions depending on the context it is taken from. . . . When . . . [I was] asked . . . [at deposition] about words like 'gay,' 'bitch,' and 'dyke,' and what they meant to me, I thought [Defendants' attorney] meant what their meaning was when talking among friends."  Pl. Aff. at ¶ 2.

It is well-settled that a party may not contradict her prior deposition testimony in an affidavit for purposes of creating genuine issues of fact.  Hayes v. New York City Dep't of Corrections, 84 F.3d 614 (2d Cir. 1996).  In this case, the questions concerning the meaning of various terms followed questions concerning the names that Plaintiff was called by the other students.  For example, at deposition, Plaintiff was asked the following questions and gave the following answers:

A.      On May 20th, C.S. called me a fucking dyke.

Q.      Well, what does she mean by that when she says it?  Do you – is that a phrase you use?

(continued...)

- 13 -

that she did not know why the other students treated her like they did, including attacking her and/or calling her names, except, perhaps, that some of the other students thought that Plaintiff had been saying bad things about them.  See, e.g., Pl. Dep. at 14,[11] 52.  Again, what

---

[10](...continued)

A.      It's a phrase, like, kids use, yeah.

Q.      Okay.  Have you used it?

A.      Yeah, probably.

Q.      Okay.  All right.  So, the phrase itself doesn't offend you.

A.      No.

Q.      It offends you that you're being called it?

A.      Yeah.

Q.      Is that the same like, with – with the phrase gay?

A.      Yeah, it doesn't – they don't really mean it.

Q.      Okay.

A.      They just say it to be rude.

In another instance, Plaintiff was specifically asked the following questions and gave the following answer:

Q:      If I called you a gay bitch, what do - what do you take that as?

A:      That you don't like me very much.

Q.      Okay.  So, you don't think of it as something sexual?

A.      Not really.
Pl. Dep. at 135.

[11] At deposition, Plaintiff was asked the following questions and gave the following answers:

Q.      What do you think precipitated or brought on the negative interaction that you've been having with these particular girls that you've identified in your complaint and your interrogatories?

A.      I don't know.

Q.      You don't have an – an idea whatsoever?

A.      I have no idea.

(continued...)

is important is not necessarily the words used, but the manner and context in which they were used.  Why was Plaintiff treated the way she was?  Here, there is insufficient evidence from which a fair-minded trier of fact could reasonably conclude that Plaintiff was treated the way she was because of her gender.

The Court certainly does not condone or countenance the conduct to which Plaintiff was subjected.  Indeed, the names to which she was subjected are deplorable and the physical assaults she endured intolerable.  The Court is sympathetic to the incidents to which

---

[11](...continued)

Q.    Have you heard from anybody, anybody told you what they think or why they think that occurred?

A.    No.

Later in her deposition, Plaintiff testified to the effect that the other students were being cruel to her because they believed that Plaintiff was saying bad things about them:

Q.    Have you ever talked to your friend . . . to find out why C.S. has engaged in this name-calling and . . . conduct with you?

A.    Yeah.

Q.    What has T.J. told you?

A.    That C.S. just says I'm talking shit about her. . . . .

Q.    Oh, so C.S. thinks you're saying things about her?

A.    Yeah.

Q.    And so that's why she's calling you names?

A.    Yeah. . . .

Q.    Okay.  So, as far as you know the – the reason C.S. has engaged in this conduct with you is because she thinks that you're out there saying bad things about her?

A.    Yes.

Q.    Okay.  Have you found out from T.J. why Ca.L. would also be engaging in the conduct. . . .?

A.    Just because, like – she's C.S.'s friend - - she is C.S.'s friend and when one of them doesn't like somebody, they all don't like them.

Pl. Dep. at 64-66.

Plaintiff was subjected.  Nevertheless, the Court finds that, based on the totality of the circumstances, no fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to harassment by the other students on account of her gender.

To the extent that Plaintiff claims she was subjected to sexual harassment by hall monitor Gilda Charlebois, the evidence in the record is that Defendant quickly resolved that matter.  Upon learning of Plaintiff's Complaints, the district transferred Charlebois to another portion of the school.  The evidence in the record is that, since Defendants took this action, Plaintiff has not had any problems with Charlebois.  Pl.'s Ex. C at p. 2.  Accordingly, the only reasonable conclusion is that Defendants reasonably responded to any instances of sexual harassment by a SRCSD employee.

For the foregoing reasons, the Title IX claims must be dismissed.[12]

c.    **Sex Discrimination Claims Brought Pursuant to 42 U.S.C. § 1983**

To the extent Plaintiff is claiming sex discrimination under 42 U.S.C. § 1983, such a claim is subsumed by the Title IX claim.  Pfeiffer v. Marion Center Area School District, 917 F.2d 779, 789 (3d Cir. 1990); Waid v. Merrill Area Public Schools, 91 F.3d 857, 862-63 (7th Cir. 1996); Hayut v. State Univ. of New York, 127 F. Supp.2d 333 (N.D.N.Y. 2000).  Even if such claims are not subsumed, for the reasons previously discussed, there is insufficient evidence to substantiate a claim of gender-based discrimination.  Accordingly, any claims brought pursuant to 42 U.S.C. § 1983 alleging sex discrimination must be dismissed.

d.    **Racial Discrimination Claims Brought Pursuant to 42 U.S.C. § 1983**

---

[12] The Court also notes that, to the extent Plaintiff claims that the other students were harassing her for being homosexual (something that does not reasonably appear to be supported by the record), Title IX does not protect against harassment on account of sexual orientation.  Simonton v. Ruyon, 232 F.3d 33, 35 (2d Cir. 2000).  Moreover, to the extent Plaintiff is claiming racial discrimination under Title IX, Title IX only governs discrimination on account of gender.  20 U.S.C. § 1681.

Plaintiff also alleges that she was discriminated against on account of her race (Caucasion) by the majority Native American population in the school to which Defendants failed to adequately respond.  In support of this claim, Plaintiff points to the fact that she had been called such names as "white slut," "white fucking bitch," "fucking white ass," and "white bitch."

It is difficult to escape the conclusion that the insults directed to Plaintiff were race-based in that they were modified by the term "white."  This conclusion is supported by the fact that the individual who appears to be primarily responsible for most of Plaintiff's problems in high-school (C.S.) is a Native American, while Plaintiff is Caucasian.  Although, for reasons previously stated, there appear to be other, personal reasons why Plaintiff, C.S. and the other students did not get along, see supra n.10, a fair-minded trier of fact could reasonably conclude that the other students used the word "white" (e.g. "white bitch") because of some racial animosity towards Plaintiff.  Unlike in the sex-discrimination context previously discussed, there is no evidence that Plaintiff believed the use of such terms as "white bitch" not to have racial meanings.

Moreover, a jury could reasonably conclude that the harassment interfered with Plaintiff's educational opportunities or benefits provided by the school.  It could reasonably be found that, based on the persistent and rather severe conduct to which Plaintiff was subjected and fear for her continued safety, Plaintiff was essentially forced to spend half of the eleventh grade taking classes through BOCES.  BOCES presents different educational opportunities than those available in the regular school curriculum.  This alone could be found to have deprived Plaintiff of access to the educational opportunities or benefits provided by the school.

### e.    Deliberate Indifference to Racial Discrimination

To succeed on her equal protection claim of student-on-student racial discrimination claim, Plaintiff must demonstrate that she was subjected to a race-based hostile educational environment and that Defendants acted with deliberate indifference. Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 140-41 (2d Cir. 1999). "Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances."  Id. at 141.

> The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself [or itself].  Thus, to establish a violation of the Equal Protection Clause . . . a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur. . . . [D]eliberate indifference can be found when the defendant's response to known discrimination is "clearly unreasonable in light of the known circumstances."

Id. (quoting Davis, 119 S. Ct. at 1674).

Here, the evidence before the Court reveals only two instances of race discrimination that were specifically made known to Defendants - the March 20, 2003 incident where Plaintiff was referred to as a "white bitch" and locked in a bathroom and the March 31, 2003 incident where Plaintiff was subjected to threats to kick her "white ass." Plaintiff admits that all other instances of alleged racial discrimination were not made known to Defendants.[13]  Nevertheless, a fair-minded trier of fact could reasonably conclude that, once the school district was aware of potential racial discrimination, all the other incidents to which Plaintiff was subjected (*e.g.* physical assaults, non-race-based name-calling, the doctored picture, etc.) were in furtherance of the race-based harassment.  See Feingold v.

---

[13] Of course, Defendants cannot have acted with deliberate indifference towards incidents of which they were not made aware.  Gant, 195 F.3d at 141.

New York, 366 F.3d 138, 151 (2d Cir. 2004) (stating that allegations of racial animosity can be considered by a trier-of-fact when evaluating a religion-based claim); Cruz v. Coach Stores, Inc., 202 F.3d 560, 572 (2d Cir. 2000) (stating that one type of hostility can exacerbate the effect of another, and that such aggravating harm is legally cognizable).

If, in fact, the harassment to which Plaintiff was subjected was race-based, the question then becomes whether Defendants' response was clearly unreasonable in light of the known circumstances. In reviewing the actions of Defendants, the issue is not "whether one can plausibly second guess the disciplinary decisions made by school administrators." Gant, 195 F.3d at 145.

It is clear that Defendants did not entirely fail to respond to the incidents of which it was made aware. C.S. was suspended on several occasions and given numerous verbal warnings. Other students also were given verbal warnings and/or suspended. In April 2003, Defendants assigned a hall monitor to Plaintiff, which had the effect of reducing the number of incidents to which Plaintiff was subjected. In some instances, Defendants' response was effective. In others it was not. This is particularly so with respect to C.S.

Without question, many of Defendants' responses were reasonable. For example, in response to all of the problems Plaintiff was having, Defendants assigned a hall monitor to Plaintiff. According to Plaintiff, this served to decrease the number of incidents to which Plaintiff was subjected. Similarly, based on the record evidence, it appears that, after Czadzeck's verbal warning, M.C. and J.D. did not engage in any further conduct toward Plaintiff. Thus, these responses appear to have been effective.

Unfortunately, the disciplinary measures taken against C.S. and C.L. did not end their conduct and the assignment of the hall monitor may have been too late. Of course, "the

ultimate failure of these measures does not mean that Plaintiffs have created a jury question

with regard to deliberate indifference. . . . Instead, the measures taken must be so

inadequate that a degree of discriminatory intent may be inferred - allowing the trier of fact to

conclude that Defendants intended for the discrimination to occur." Yap v. Oceanside Union

Free Sch. Dist., 303 F. Supp.2d 284, 294 (E.D.N.Y. 2004).  The Court finds that, based on

the totality of the circumstances, the trier of fact could make such a conclusion.

As of March 2003, Defendants knew there were problems between C.S. and

Plaintiff (e.g., the February 20th fight).  There is, however, no evidence suggesting that

Defendants had any reason to know that the February 20th incident was racially motivated.

The next incident involving C.S. and Plaintiff was the March 20 bathroom incident.  In

response to this incident, C.S. (who admitted holding the bathroom door shut) was

suspended and the other girls were reprimanded.  This incident involved use of racial

epithets.  Thus, a jury could reasonably conclude that, at this point in time, Defendants

should have been aware of potential racial animosity behind C.S.'s conduct.  In light of the

frequency and severity of the ensuing conduct throughout the remainder of the 2003-2004

school year (continued name-calling, physical threats, the doctored photograph, an incident

requiring the intervention of the police, etc.), many of which the school was made aware of,

or reasonably should have been aware of, through Plaintiff, Milly Patenaude, its agents, or

other sources, the Court finds that there are triable issues of material fact concerning

whether Defendants' response during the 2003-2004 school year was clearly unreasonable.

For example, the trier of fact could reasonably conclude that the failure to take more severe

disciplinary action, up to and including expulsion, against C.S., was clearly unreasonable

For the foregoing reasons, the Court finds that there are triable issues of fact concerning whether Plaintiff was harassed by co-students on account of her race and, if so, whether Defendants' response thereto was clearly unreasonable.

### f.    Individual Liability

"[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." Patterson v. County of Oneida, New York, 375 F.3d 206, 229 (2d Cir. 2004). "Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." Id. For the reasons previously discussed, a fair-minded trier of fact could conclude that Czadzeck was aware of alleged instances of racial discrimination by the other students but failed to take appropriate action. This may be sufficient to establish personal involvement.

With respect to Defendant Bellinger, however, Plaintiffs have failed to provide any evidence tending to suggest that he was personally involved in the violation of any of D.P.'s constitutional rights. Plaintiffs have not pointed to any evidence that he actually participated in any alleged violations or failed to act upon receiving information that constitutional violations were occurring. Accordingly, the Complaint must be dismissed as to him.

### g.    Official Capacity Claims

The official capacity claims must be dismissed because, by suing the individuals in their official capacities, the Plaintiff is really just suing the school district. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (noting that, in a § 1983 action, a suit against individuals

in their "official capacity" is effectively a suit against the entity to which they belong).  Thus, the official capacity claims are redundant to the claims against the school district.

  **h.**  **Retaliation**

   Defendants also move to dismiss Plaintiffs' First Cause of Action alleging retaliation.  In response to Defendants' motion for summary judgment on this Court, Plaintiffs have failed to respond.  Accordingly, they are deemed to have abandoned this claim.

   In any event, this claim must be dismissed as a matter of law.  The First Cause of Action alleges that Defendants retaliated against Plaintiff "for attempting to assert her rights to a free public education without sexual harassment, assaults, and verbal threats."  Am. Compl. at ¶ 71.  The basis for this allegation is that on May 29, 2003, Plaintiff was given in-school detention for leaving school early without permission.  Plaintiff contends that her mother signed her out.  In his reply affidavit, Czadzeck admits that the school made a mistake and that, in fact, Plaintiff was properly signed out.

   There is insufficient evidence of an adverse action taken against Plaintiff.  Although Plaintiff was forced to suffer an hour and one-half of after-school detention, there is no evidence that this interfered with her schooling in any way.  To the contrary, Plaintiff was given after-school detention to avoid removing her from her classroom activities.  This is not a sufficiently severe adverse action to implicate Plaintiff's educational rights.  Moreover, there simply is no evidence that Defendants imposed in-school detention upon Plaintiff for any improper purpose.  Stated otherwise, there is no causal connection between the detention and Plaintiff's claimed right to a free public education or any other protected basis.

  **i.**  **Special Relationship - Due Process**

In her opposition papers, Plaintiff argues that Defendants should be liable for the actions of the other students because Plaintiff enjoyed a special relationship with Defendants which imposed a duty upon them to protect her. To the extent Plaintiff is asserting a due process claim, it must fail. As the Tenth Circuit has stated:

> schools have no duty under the Due Process Clause to protect students from assaults by other students, even where the school knew or should have known of the danger presented. If the state takes a person into custody or holds him against his will, the state assumes some measure of a constitutionally mandated duty of protection. [Graham v. Independent Sch. Dist. No. I-89, 22 F.3d 991, 994 (10th Cir. 1994)]. Compulsory attendance laws for public schools, however, do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school. Id. (citing Maldonado v. Josey, 975 F.2d 727, 732 (10th Cir. 1992), cert. denied, 507 U.S. 914, 113 S. Ct. 1266, 122 L. Ed.2d 662 (1993)). Inaction by the state, in the face of a known danger, is not enough to trigger a constitutional duty to protect unless the state has a custodial or other "special relationship" with the victim. See Graham, 22 F.3d at 995. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 200, 109 S. Ct. 998, 1005-06 (1989). The school district in this case did not limit [plaintiff's] freedom to act on his own behalf, and therefore, no special relationship arose triggering a constitutional obligation to protect [plaintiff] from other students.

Seamons v. Snow, 84 F.3d 1226, 1235-36 (10th Cir. 1996). Other Circuit Courts are in agreement. See Doe v. Hillsboro Independent Sch. Dist., 113 F.3d 1412, 1415 (5th Cir. 1997); Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 911 (6th Cir. 1995); Dorothy J. v. Little Rock School Dist., 7 F.3d 729, 732 (8th Cir. 1993); D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1368-73 (3d Cir. 1992) (en banc); J.O. v. Alton Community Unit School Dist. 11, 909 F.2d 267, 272 (7th Cir. 1990); see also Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 655 (1995) ('[W]e do not, of course, suggest that public schools as a

general manner have such a degree of control over children as to give rise to a constitutional 'duty to protect.'"). This Court agrees and adopts the reasoning of the above-cited cases.

### j.    Negligence

Defendants also move to dismiss Plaintiffs' negligence claim on the ground that it is insufficient as a matter of law. In support, Defendants merely argue that "[c]ases which found negligence (or negligent supervision) on the part of the school defendants have involved far more egregious circumstances than the teasing, name-calling, bickering and minor physical altercations alleged here."

In moving for summary judgment on this claim, Defendants have not met their burden of proof. Defendants have failed to demonstrate the absence of any genuine issues of fact on this claim.

In New York, there is a duty owed by a school to its students. Pratt v. Robinson, 39 N.Y.2d 554, 560 (1976). This duty "stems from the fact of its physical custody over them." Id. Here, Plaintiff was the victim of numerous incidents while in school and under the custody of Defendants. In light of the information available to Defendants, the failure to take reasonable action against C.S. or other students may have constituted a breach of that duty of care and may have caused Plaintiff to suffer damages.

For the foregoing reasons, Defendants' motion to dismiss the Fourth Cause of Action is DENIED.

### k.    Derivative Claims

Defendants also move to dismiss the derivative claims of Milly and Michael Patenaud. Derivative claims are not recognized under 42 U.S.C. § 1983 or Title IX. Jackson v. Johnson, 118 F. Supp.2d 278, 286 (N.D.N.Y. 2000), aff'd in part & dismissed in part, 13

Fed. Appx. 51 (2d Cir. 2001) (42 U.S.C. § 1983); Prtizker v. City of Hudson, 26 F. Supp.2d 443, 445 (N.D.N.Y. 1998) (42 U.S.C. § 1983); Doe v. Bridgeport Ind. Sch. Dist., 1996 WL 734949, at *2 (N.D. Tex. 1996) (Title IX).

 With respect to the parents' derivative state law claims, Defendants argue that they owed no duty of care to Milly and Michael Patenaud.  Plaintiffs have failed to respond. Derivative claims are not separate torts and do not require a separate duty of care running from Defendants to the parents.  See Moore v. Ewing, 781 N.Y.S.2d 51, 55-56 (2d Dep't 2004).  Accordingly, Defendants motion in this regard is DENIED.

 **I.**  **Punitive Damages**

 Lastly, Defendants seek to dismiss the claim for punitive damages.  This request must be granted as to the SRCSD because punitive damages are not available against school districts.  Pierce ex. rel. Pierce v. Sullivan West Central Sch. Dist., 379 F.3d 56, 57 n.3 (2d Cir. 2004); Hargraves v. Bath Central Sch. Dist., 237 A.D.2d 977, 9789 (4th Dep't 1997).  There is, however, no such prohibition on the imposition of punitive damages on the individual defendants.

**V.**  **CONCLUSION**

 For the foregoing reasons, Defendants' motion to dismiss the First and Third Causes of Action is GRANTED.  Defendants motion is GRANTED as to the Second Cause of Action insofar as that claim alleged gender-based discrimination.  To the extent Plaintiffs' Second Cause of Action alleges race-based discrimination, Defendants' motion to dismiss is DENIED.  Plaintiffs' claims for punitive damages against the SRCSD is DISMISSED.  In all other respects, Defendants' motion is DENIED.

IT IS SO ORDERED.

Dated:February 16,2005

Thomas J. McAvoy
Senior, U.S. District Judge